**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JONATHAN DAVID SMITH, SR.          *

Petitioner          *

v          *          Civil Action No. PJM-10-2007

JOHN S. WOLFE, et al.          *

Respondents          *
          ***

<u>**MEMORANDUM OPINION**</u>

Pending in the above-captioned case is the response to the Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. §2254.  ECF No. 5.  In light of Respondents' assertion that the petition should be dismissed because it raises claims which have not yet been exhausted, this Court provided Petitioner Jonathan David Smith ("Smith") an opportunity to respond.  Petitioner has filed his Reply (ECF No. 9) and the matter is now ripe for this Court's review.  The Court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2010);  *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)).

**Background**

After a jury trial lasting from February 26, 2001 through March 1, 2001, Smith was convicted of first degree murder in the Circuit Court for Talbot County, Maryland.  ECF No. 5 at Ex. 1.  The victim, Adeline Wilford, was killed in her home on January 5, 1987.  Facts adduced at trial established that:

> She died from loss of blood caused by multiple stab and cutting wounds inflicted with several knives in a most gruesome manner.  A number of the wounds were described as defensive wounds, caused as

she attempted to shield herself from the attack.  From the evidence found at the scene, the police concluded that intruders had entered the house through a window in the utility room, that they were apparently looking for money or property, that Ms. Wilford returned home while they were in the house, and that one or more of them killed her.  She still had her coat on when her body was discovered, her keys were in the back door, unpacked groceries were on the kitchen table, the living room and an upstairs bedroom were in disarray, and her pocketbook, wallet, credit cards, an undetermined amount of cash, and some jewelry were missing.  Although fingerprints were recovered from the utility room window and bloody footprints were found on the kitchen floor and front porch, the police were unable to make an identification from them.  None of the missing property was ever recovered.  Despite following every lead, the police could not develop a suspect, and the case remained more or less dormant for about 12 years.

ECF No. 5 at Ex. 3, p. 1.

A break in the case occurred after Ms. Wilford's son offered a $10,000 reward for information leading to the arrest of her killer, with an additional $15,000 for information leading to the conviction.  *Id*.  Smith's aunt, Beverly Haddaway, learned of the reward money, contacted the State Police, and provided information implicating Smith as well as two other men, David Faulkner and Ray Andrews.  Haddaway claimed she encountered the three men on the day of the murder, near Ms. Wilford's house, where the four of them engaged in a conversation.  Based on this information, police convinced Haddaway to wear a body wire and instructed her to engage Smith in a conversation about the murder which would be recorded.  On April 11, 2000, Haddaway invited Smith over to her house, engaged him in a conversation about the murder, and recorded incriminating responses from her nephew.  *Id*.  Haddaway later testified that when she saw Smith on the day of the murder she noticed his shirt was flecked with small red spots.  Smith had explained the stains by claiming he had killed a dog with a knife after it had bitten him.

Police took Smith to the station for questioning two weeks after his visit with Haddaway.

He was given *Miranda*[1] warnings before acknowledging that he had gone to Wilford's home the day of the murder with Faulkner and Andrews.  He explained that Andrews stayed outside while he and Faulkner went into the house.  While there, Wilford had returned home.  Smith claimed that he saw Wilford standing in front of him screaming while Faulkner was stabbing her.  Smith gave police a description of what Wilford was wearing and said she was fighting and moving her arms.  Questioning of Smith ceased after he was asked if he had stabbed Wilford and he invoked his right to an attorney.  *Id.*

Evidence produced at trial to convict Smith did not include physical evidence connecting him to the scene.  Haddaway's testimony about her encounter with Smith, Andrews and Faulkner was presented as well as the taped statements made by Smith, Sergeant Bollinger's testimony regarding Smith's statements during questioning, the testimony of Smith's co-defendant Andrews, and the testimony of Smith's former cell-mate[2] at the Talbot County Detention Center. Andrews, who entered an *Alford*[3] plea to involuntary manslaughter,[4] testified he waited outside while Smith and Faulkner went inside the house.  He also recalled encountering Haddaway on a road near the field they ran across and Smith explaining the blood spatter on his shirt by telling Haddaway that he had killed a dog when it bit him.  Andrews stated that the three men went to Smith's house where Smith and Faulkner produced money from their pockets.  Andrews claimed he did not get any of the money and that he was not told what happened inside the house.  *Id.*

Smith's cell-mate from the detention center, Michael Snow, testified that he asked Smith

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The cell-mate was a former police officer awaiting sentencing for bank robbery.

[3] *North Carolina v. Alford*, 400 U.S. 25 (1970).

[4] The sentencing recommendation for Andrews was five years.

3

if he really killed "the woman" and claimed Smith had answered that he had.  Snow further

testified that Smith told him he killed Ms. Wilford because she had startled him when she came

into the house and that while she was fighting with him she bit him.  Snow claimed that Smith

told him he went crazy when Wilford bit him.  *Id.*

The jury returned a guilty verdict on charges of felony murder and daytime housbreaking.

Smith filed a motion for new trial and argued that exculpatory DNA evidence was withheld.

ECF No. 5 at Ex. 4.  The trial court denied the motion without hearing and on April 30, 2001,

sentenced Smith to life imprisonment.  *Id.* at Ex. 2, p. 1.

Smith filed a direct appeal with the Maryland Court of Special Appeals.  He claimed that

the trial judge erred by: denying his motion for new trial; excluding as irrelevant questions

regarding Haddaway's motive to testify;  and refusing defense counsel's request to reinstruct the

jury on "mere presence at scene" after the jury asked if it was sufficient to support a guilty

finding for felony murder.  ECF No. 5 at Ex. 2, p. 1.  On January 12, 2002, the appellate court

vacated the trial court's order denying the motion for new trial and remanded the case for a

hearing on the motion.  *Id.*  The convictions were otherwise affirmed in the unreported opinion.

Smith appealed the adverse rulings of the Court of Special Appeals to the Court of

Appeals.  *Id.* at Ex. 3.  On November 4, 2002, the Court of Appeals affirmed the decision of the

Court of Special Appeals with respect to the exclusion of questions regarding Haddaway's

motives and the jury instruction on felony murder.  *Id.*  With respect to the motives of

Haddaway, Smith had sought to introduce evidence to establish a conspiracy between

Haddaway, Andrews and Andrews' attorney, Grayson Eckel.  ECF No. 5 at Ex. 3 p. 5. The

theory was explained by the court as follows:

4

> The thrust of the alleged conspiracy was that [Smith's] father had owned a tract of land which, if the father died intestate, [Smith] would inherit and that, immediately before trial, counsel learned that Mr. Eckel, who also represented Ms. Haddaway's daughter, Laci Janda, produced a holographic will leaving the land to Ms. Janda.

*Id*.  In upholding the trial court's exclusion of the impeachment evidence, the Court of Appeals noted that Smith's attorney was able to produce other evidence of bias or interest on the part of Haddaway such as the fact she waited almost 12 years to go to the police and did so only after a reward was offered and had a vested interest in receiving still more money upon the conviction of her nephew.  *Id*. at p. 10.  Defense counsel, after being denied the opportunity to present the conspiracy theory based on the will, couched his argument to the jury in terms of Haddaway's interest in receiving the reward money and Andrews's interest in favorable sentencing in exchange for his *Alford* plea.

With respect to the jury instruction issue, the Court of Appeals found the repetition of the felony-murder instruction to be a fair and accurate response to the jury's question after noting that supplementation of jury instructions is a matter best left to the sound discretion of the trial court.  *Id*. at pp. 14—15.

On June 3, 2003, the Circuit Court for Talbot County held a hearing on Smith's motion for a new trial, as required by the Court of Special Appeals' decision vacating and remanding the previous denial of the motion.  At the hearing, Smith's counsel did not argue the DNA evidence claim originally asserted, but instead offered evidence to support the claim that Smith had been set-up by Haddaway and Andrews.  The evidence offered was the same conspiracy theory involving Haddaway, Andrews, Grayson Eckel and Haddaway's daughter.  Additional evidence of the alleged conspiracy included the fact that Eckel had represented Haddaway in a civil suit to

collect the additional $15,000 in reward money.   Counsel also argued that "'if there were a scheme' to frame [Smith] for the reward money, 'there would really be no better way to implement that scheme than to have the same lawyer representing' Ms. Haddaway and Mr. Andrews, because 'one single lawyer' would 'be able to orchestrate that.'   ECF No. 5 at Ex. 4, p. 7.   Counsel further claimed that even though Andrews had denied there was a deal between himself, Haddaway and Eckel, the representation by Eckel of both a defendant and a witness in criminal cases of the same subject matter "has left a stink on the case . . . and that stink unfortunately can't be washed away."   *Id*. at p. 8.   The trial court denied the motion for new trial because in its view, "[t]he fundamental fairness of [Smith's] trial was not compromised."   *Id*.

Smith appealed the denial of the motion to the Court of Special Appeals which affirmed the trial court's decision on November 4, 2004[5], noting that granting a new trial remains within the discretion of the trial court.   ECF No. 5 at Ex. 4, p. 9.   The Court of Special Appeals noted, with approval, the trial court's reasoning:

> [Smith's] counsel suggests that Eckel was the instrumentality by which Haddaway influenced Andrews to give false testimony.   However, the fact that Eckel represented the interests of Andrews, Janda, and Haddaway at any given time proves only that Eckel exercised incredibly bad judgment in avoiding conflicts of interest, no that he exercised any influence over Andrews on behalf of Haddaway. . . . All that the court has before it is the conjecture of [Smith's] counsel, who is trying to help Smith in a situation in which, if the conspiracy theory were true, [Smith] refuses to help himself.   Therefore, the court must find as the jury found, i.e., that the theory of [Smith's] counsel, while possible, is improbable and unsupported by any evidence.

*Id*.   Smith did not seek further appellate review on this issue.

Smith filed a post-conviction petition on September 28, 2005, in the Circuit Court for

---

[5] The court's mandate issued December 6, 2004.  ECF No. 5 at Ex. 4.

Talbot County.  ECF No. 5 at Ex. 5.  He alleged trial counsel was ineffective for failing to prevail on the motion to suppress evidence from the wiretap conversation, failing to obtain an adequate translation mechanism to compensate for his hearing impairment,[6] and failing to convey a plea offer.  In addition Smith claimed the police denied him access to an attorney when he was questioned, the trial court imposed an improper sentence, and the trial court failed to adequately inquire about his hearing impairment.  *Id*. at Ex. 7.

A post-conviction hearing was held on August 1, 2008.  The Circuit Court denied relief in a written opinion dated April 13, 2009.  ECF No. 6 at Ex. 7.  Smith sought appellate review of the post-conviction court's decision via an application for leave to appeal filed with the Court of Special Appeals.  *Id*. at Ex. 8.  In an unreported opinion dated June 9, 2010, the Court of Special Appeals denied Smith's application for leave to appeal.  The mandate was issued on July 9, 2010.  *Id*. at Ex. 9.

### Claims in this Court

In his Petition filed with this Court Smith claims: (1) the trial court denied him his rights under the Americans with Disabilities Act; (2) the trial court erred when it did not provide either an interpreter or a telemonitor to Smith for purposes of keeping track of the proceedings; (3) the post-conviction court erred when it did not allow counsel to file a supplemental petition; and (4) the wiretap used to record conversation between Smith and Haddaway was illegal under Maryland law.  ECF No. 1 at pp. 8 – 9.  Smith states that none of these claims were raised in state court because he was advised by counsel the claims were not preserved at trial or on appeal.

---

[6] An audiologist testified on behalf of Smith at the post-conviction hearing that he has a "severe to profound hearing loss" and that "with one hearing aid and with the best amplification possible, Smith could only hear 10 – 20% of the proceeding."  The audiologist acknowledged on cross examination that Smith reads lips, but does not know sign lanugage.  ECF No. 5 at Ex. 7, p. 8.

*Id*. at pp. 10 – 11.

## Exhaustion

When filing a federal habeas corpus application under 28 U.S.C. § 2254, a petitioner must show that all of his claims have been presented to the state courts.  28 U.S.C. §2254(b) and (c); *see also Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973).  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider it.  For a person convicted of a criminal offense in Maryland this may be accomplished either on direct appeal or in post-conviction proceedings.

## Analysis

In support of his assertion that the merits of his claims should be heard, Smith asserts that he was prejudiced by the trial court because he was not provided with a telemonitor[7] so that he could understand what was being said at his trial.  ECF No. 9 at p. 2.  He explains that his hearing disability makes it impossible for him to understand what is being said unless the speaker is facing him.  Additionally he states that words spoken must be repeated back to him in order to insure he has properly understood what was being said at the time.[8]  At trial Smith could not always see the speaker and therefore did not always know what was being said.  Had a telemonitor been provided during trial, Smith asserts he could have been able to assist in his defense because he would have known what was actually being said and by whom.  *Id.*  Smith points out that the post-conviction court recognized the need for a telemonitor and provided it to

---

[7] Smith appears to abandon his claim that he should have been provided with an interpreter.  It was established at trial that he does not know or understand sign language. ECF No. 5 at Ex. 7, p. 10.

[8] In a letter dated July 1, 2003, the doctor who provided Smith with his hearing aid, J. Michael Canary, wrote that Smith "requires the most powerful hearing aids made and then can only understand 50 – 60% of oral speech."  ECF No. 9 at p. 5.  He further states that "he depends on a combination of his high power hearing aids and lip reading to understand verbal communication" and even under the "best of circumstances" Smith "will still misunderstand 15 – 25% of the spoken word." *Id.*

him during the post-conviction hearing.  Smith further states that he did not exhaust the claims

raised herein because he was advised by counsel that he could not raise the claims in state court.

This Court may not address the merits of an unexhausted claim.  Smith raised a claim in

post-conviction proceedings that the trial court erred when it failed to make accommodations

during the trial for his hearing impairment, but did not allege a violation of the Americans with

Disabilities Act (ADA).   ECF No. 5 at Ex. 7.  Respondent has not waived the exhaustion

argument, but states that Smith has a conceivable means for raising the unexhausted claims in

state court.  The question remains whether the instant petition should be dismissed or stayed

pending Smith's exhaustion of the claims through Maryland's courts.

This Court may exercise its discretion to stay a habeas matter in limited circumstances,

> [G]ranting a stay effectively excuses a petitioner's failure to present his
> claims first to the state courts, stay and abeyance is only appropriate
> when the district court determines there was good cause for the
> petitioner's failure to exhaust his claims first in state court. Moreover,
> even if a petitioner had good cause for that failure, the district court
> would abuse its discretion if it were to grant him a stay when his
> unexhausted claims are plainly meritless.

*Rhines v. Weber,* 544 U.S. 269, 277 (2005).  In the instant case the claims raised by Smith cannot

be rejected as plainly meritless.  There is no unfounded stretch of the facts or law involved in his

assertion that he is profoundly hearing impaired and he could not effectively participate in aiding

in his own defense.  His failure to raise these claims in post-conviction do not appear to be an

attempt on his part to bypass the state courts or to thwart the purposes of the exhaustion

requirements of 28 U.S.C. §2244.

An additional consideration is whether dismissal without prejudice of the petition would

result in a subsequently filed petition being time-barred.  Smith's conviction was final on

January 5, 2005, the date the time for seeking certiorari of the Court of Special Appeals decision affirming the trial court's second denial of his Motion for a New Trial expired.  At that time the filing deadline for a federal habeas petition was January 6, 2006, but the one year period was tolled on September 28, 2005, when Smith filed a petition for post-conviction relief. At the time the filing period was tolled there were three months remaining on the one year filing period.  The filing deadline remained tolled until July 9, 2010, the date the Court of Special Appeals summarily denied Smith's Application for Leave to Appeal.  The instant petition was filed 13 days later on July 22, 2010.  If the petition is dismissed without prejudice any subsequently filed petition will be time-barred.  The filing of a federal habeas petition does not toll the limitations period.  *See Duncan v. Walker*, 533 U.S. 167, 176 (2001).

Thus, the petition will be stayed pending Smith's exhaustion of the issues raised.  Smith is cautioned that his failure to promptly pursue either a motion to reopen post-conviction proceedings or any other avenue seeking review of the claims in state court will result in dismissal of the petition without prejudice and without further notice.  Further, Smith must promptly notify this Court of the progression of his case through the state courts.

A separate Order follows.

/s/
_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

September 27, 2011